## Gray's Administrator v. Dixon et al.

(Decided June 22, 1934.)

COLEMAN TAYLOR for appellant.
O. M. SMITH and C. A. DENNY for appellees.

240

Frank Gray died on the 8th day of July, 1931, intestate, and a resident of Logan county, Ky. He left surviving him as his only heirs and distributees at law his full-brother, Chas. Gray, a half-brother, J. P. Dixon, four half-sisters, and the children of a half-brother himself then deceased. At the time of his death, Frank Gray had on deposit on open account in the Lewisburg Banking Company $914.56, one United States Government bond of par value of $50, and ten promissory notes aggregating $855 in par value. Frank Gray had not associated much with his relatives of the half-blood, but for many years he and his brother Charlie Gray had operated a farm together. After they ceased farming together, Charlie Gray soon thereafter moved to Evansville, Ind. Frank Gray remained in Kentucky and supervised and looked after the farm of Dr. W. B. Gilliam. Shortly before his death, Frank Gray was taken seriously ill while at the home of Dr. Gilliam. He sent for his brother Charlie to come and get him. While Frank Gray was waiting for his brother Charlie to come for him, Dr. Gilliam, who was looking after Frank Gray, suggested to him that he ought to make a will disposing of his property. Frank Gray replied that what he had would all be "Charlie's," anyhow, and that the latter could do as he pleased with it. This is testified to by Dr. Gilliam and by his sister, Mrs. Prudy Walker. D. V. Gilliam, who saw Frank shortly before Charlie came and got him, testified that the Sunday morning before Frank left Dr. Gilliam's home he was shaving Frank; that he was owing Frank some money, and as he knew Frank was about to leave, he brought the subject up and expressed regret at his inability to pay what he owed at that time, and that Frank replied that he shouldn't worry, that he (Frank) was not needing it, and he aimed to turn everything he had over to Charlie anyhow, and wanted Charlie to take those notes and carry them just as he had and until things opened up so that the boys could pay him, and he thought Charlie would do that. Charlie came to Dr. Gilliam's home and got Frank and took him back to Evansville, where they arrived on July 5th. Charlie Gray's daughter and daughter-in-law testified that shortly after Frank had arrived at Charlie Gray's home, Frank Gray took from his pocket his bank book and the notes and

bond above mentioned, read them over, handed them to Chas. Gray, and said to him: "These are yours; I want you to have them and after my death, I want you to pay my burial expenses." Charlie Gray took possession of the bank book, notes, and bond. Frank Gray was removed to a hospital, where he died on the 8th of July. After Frank Gray had been buried, Charlie Gray came to Logan county and went before the county judge, relating to him the facts and asking him what he should do, and the county judge told him the only thing for him to do was to qualify as administrator of his brother's estate; otherwise he could not get the money out of the bank wherewith to pay the funeral expenses and other debts of his brother. Thereupon Charlie Gray qualified as administrator of his deceased brother. Appraisers were appointed for the estate. Despite the fact that Charlie Gray told them about the gift to him by his brother of the property above mentioned, these appraisers at first appraised the same as the property of Frank Gray, deceased. The three appraisers testified. Of these, D. V. Gilliam makes it plain that Charlie Gray at the time he qualified as his brother's administrator laid claim to the above-mentioned property as a gift from his brother, and that the reason the estate was appraised as it was originally was because they understood from the directions of the county judge that that was what they had to do. T. M. Allen, another of the appraisers, corroborates D. V. Gilliam as to what happened at the time of the appointment of Charlie as administrator and of the appraisement. The third appraiser, Bland Arnold, while not contradicting Gilliam or Allen, does not recollect clearly what took place at the time the appraisement was made. At all events, subsequently and at the request of Charlie Gray, the appraisers filed an amended appraisement in which they set up that Charlie Gray was claiming the property in question as a gift to him from his brother. Later this suit was brought by the other heirs and distributees at law of Frank Gray against Charlie Gray individually and as administrator of his deceased brother asking for a settlement of the estate, and that the property above mentoned be adjudged to belong to the estate of Frank Gray. Charlie Gray by his answer set up his claim to the property as a gift causa mortis. The lower court held that the property belonged to the estate of Frank Gray, and from the judgment so adjudging, Charlie Gray prosecutes this appeal.

We are of the opinion that the evidence clearly establishes a gift causa mortis of the property in question to Charlie Gray. We have the evidence of disinterested witnesses that just prior to Frank Gray's death he expressed his intention to make a gift of all his property to Charlie Gray. We have next the testimony of two witnesses, perhaps interested but uncontradicted, that the gift was made. Furthermore, we have the circumstances that such a gift was a natural thing for Frank Gray to make, since he and Charlie had been intimate, whereas the rest of his relatives and he had not been so. The only evidence that tends to weigh against the claim of a gift causa mortis is the appointment of Charlie Gray as administrator of his brother's estate, coupled with the original appraisement which lists this property as belonging to the estate of Frank Gray. We think, however, that the evidence clearly shows that this latter was a mistake and that Charlie qualified as his brother's administrator relying on the advice of the county judge to whom he had made plain the situation as he now claims it to be. The county judge was not introduced to contradict the testimony of the appraisers to the effect that at the time Charlie Gray was appointed administrator he made it plain that he was claiming the property in question as his own or to contradict the statement of these appraisers that they made the original appraisement as the did at the suggestion and direction of the county judge. Counsel for appellees does not question but that if the government bond was actually handed to Charlie Gray, accompanied by the words which the daughter and daughter-in-law of Charlie Gray said Frank Gray used when he handed this property to Charlie, that there was a gift causa mortis of the bond. That the same is equally true of the notes and the bank account, although the notes were unindorsed when handed to Charlie Gray and the bank account was represented solely by the passbook and not by a check, is settled in the case of the notes by Ashbrook v. Ryon's Adm'r, 2 Bush, 228, 92 Am. Dec. 481, and in the case of the bank deposit by McCoy's Adm'r v. McCoy, 126 Ky. 783, 104 S. W. 1031, 1032, 31 Ky. Law Rep. 1189. In the Ashbrook Case, we said:

"In Turpin v. Thompson, etc., 2 Metc. 420, this court held, that the doctrine that a promissory note given causa mortis must either be payable to bearer or be assigned has been exploded, and that now

the delivery of such note passes the beneficial interest to the donee; and we regard this as the rational doctrine more accordant to principle and modern authority.''

In the McCoy Case, after pointing out that so much of the Ashbrook Case as held that a gift causa mortis of an open account in bank could not be effected by the delivery of the passbook had been practically overruled by the case of Stephenson's Adm'r v. King, 81 Ky. 425, 50 Am. Rep. 173, we said:

"We are of the opinion that there may be a gift of the money on deposit in a bank by the delivery of the pass book; and this, without reference to whether it be a savings bank or an ordinary deposit bank.

''A distinction between savings banks and other banks is made in Jones v. Weakley [99 Ala. 441, 12 So. 420, 19 L. R. A. 700, 42 Am. St. Rep. 84] and Page, Thomas' Adm'r, v. Lewis [89 Va. 1, 15 S. E. 389, 18 L. R. A. 170, 37 Am. St. Rep. 848], supra, based upon the ground that in savings banks the fund can only be withdrawn by the production of the pass book, hence it is the best delivery available under the circumstances, while in other banks, as the check of the depositor is sufficient to transfer the funds to the holder of the check, and in fact the usual, if not only, method by which the deposit can be transferred, the production of the book at the bank not being necessary, a check should be made out by the donor, as this would be more appropriate evidence of the gift than the delivery of the book. We are not impressed with the soundness of this attempted distinction. It is well settled that there may be a constructive or symbolical delivery, as of the key to a trunk or vault in which the property is deposited, or a book of accounts. Stephenson v. King, [81 Ky. 425, 50 Am. Rep. 173], supra; Jones' Adm'r v. Moore, 102 Ky. 593, 44 S. W. 126 [19 Ky. Law Rep. 1640]; 14 Am. & Eng. Ency. of Law, p. 1021. And the delivery of a pass or deposit book in any bank as a gift, although symbolical, manifests as clear an intention to transfer to the donee the money represented by it as does any other constructive delivery. The mere fact that a check might be better evidence of the intention to make the gift complete will not be allowed to de-

244

feat the purpose of the donor. In this class of cases, as well as others, the intention of the giver must be looked into. The purpose with which the delivery is made must be considered; and from the facts and circumstances surrounding the transaction the court or jury trying the case must determine whether or not the gift was designed to be and was completed. Generally the delivery must be as perfect as the nature of the property will admit; but the manifest desire of the donor will not be set aside by a narrow construction that would defeat his purpose. In the case before us there is little room to doubt that Mrs. McCoy by the delivery of the book intended to transfer all that the book represented, and in her eyes it stood for all the money on deposit in the bank. If she had written a check for the amount of her deposit and given it to her son, or if the money, in place of being in bank, had been in her possession, and she had handed it to him, it would not have illustrated with any more clearness or certainty her intention than did the delivery of the book. Ellis v. Secor, 31 Mich. 185, 18 Am. Rep. 178.''

Being of the opinion that the record clearly makes out a gift causa mortis of the property here involved, it is our opinion that the lower court erred in rendering the judgment it did. Its judgment is therefore reversed, with directions to enter a judgment in conformity with this opinion.